Filed 9/3/15  P. v. Podgurski CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064114 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD227563) |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| WANDA PODGURSKI, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT

It is ordered that the opinion filed herein on August 14, 2015 be modified as follows:

On page 37, the first sentence is modified to add the words "for a jury" following the words "remand the matter to the trial court," so that the sentence reads:

> Because on this record we are unable to determine whether counts 1-3 are time-barred based on the applicable statute of limitations, we reverse defendant's conviction with respect to these counts only and remand the matter to the trial court for a jury to determine both (i) when the prosecution of counts 1-3 commenced and, depending on the outcome of that issue, (ii) whether in fact counts 1-3 are time-barred by the applicable limitations period.

The petition for rehearing filed on August 24, 2015 has been considered by Justices Benke, Huffman and McIntyre and is denied.

THERE IS NO CHANGE IN JUDGMENT

BENKE, Acting P. J.

Copies to:  All parties

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064114 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD227563) |
| WANDA PODGURSKI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed in part; reversed in part.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Kevin Vienna and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Wanda Podgurski guilty of 29 counts of insurance fraud.  The jury found true that in the commission of the offenses (i) defendant

took funds and/or property of another in excess of $100,000, within the meaning of Penal Code[1] sections 1203.045, subdivision (a) and 186.11, subdivision (a)(1); (ii) the aggregate losses to the victims from all counts exceeded $200,000 within the meaning of section 12022.6, subdivision (a)(2); and (iii) defendant, in the commission of two or more related felonies a material element of which was fraud and embezzlement and which involved a pattern of related felony conduct, took more than $500,000 within the meaning of section 186.11, subdivision (a)(2). The court sentenced defendant in absentia to 20 years four months in state prison, after defendant failed to appear at sentencing.

Defendant on appeal raises a series of contentions including (1) prosecutorial misconduct; (2) sentencing error; (3) failure to prosecute within the applicable statute of limitations; and (4) insufficiency of the evidence on certain counts.

As we explain, because on this record we cannot determine whether counts 1-3 are time-barred under the applicable statute of limitations, we reverse defendant's conviction with respect to these counts only and remand the matter to the trial court to determine after hearing both (i) when the prosecution of counts 1-3 commenced and, depending on the outcome of that issue, (ii) whether in fact counts 1-3 were time-barred as defendant contends. If the court determines counts 1-3 were timely commenced, it then can reinstate defendant's conviction on these counts. In all other respects, the judgment of conviction is affirmed.

---

[1] All further statutory references are to the Penal Code.

BACKGROUND[2]

A. *Disability Claims*

In October 1980, defendant began working as a reservations and information clerk for Amtrak. In 1983, she purchased three disability insurance policies from Balboa Insurance (Balboa). In February 1986, defendant purchased a disability income policy from Reassure American Life Insurance (Reassure). About two months later, defendant filed her first disability claim with Reassure. In 2008, Reassure had paid defendant about $123,000 on this policy. Defendant was disabled under the Reassure policy for about 13 of the 22 years it was in place (determined in 2008), or for about 59 percent of the time.[3]

Between 1996 and 2000, defendant took an unpaid medical leave from Amtrak after claiming she had suffered a slip-and-fall injury outside of work. Defendant in June 1996 submitted a claim to Reassure that was paid through early September 1999. Defendant returned to work for Amtrak in March 2000, but then took another leave of absence about a year later.

In 2001, defendant claimed she fell in the shower. Defendant took a leave of absence from Amtrak and filed disability claims with Reassure and Balboa. Over the next three years, defendant received the maximum disability payments available under both polices.

---

[2] We view the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to certain of defendant's contentions are discussed *post*.

[3] The record shows this number rose to 64 percent because Reassure paid plaintiff additional benefits after 2008.

3

Defendant in August 2004 returned to work at Amtrak. Although Amtrak did not pay defendant while she was on medical leave between March 2001 and August 2004, defendant did receive some payments from the Railroad Retirement Board. After defendant returned to work, she again went out on medical leave for a nonwork-related injury. The record shows defendant over the next year or two took several additional medical leaves from Amtrak, until September 2006, when she went on leave and never returned.

During this period of time, and in particular in April 2004, defendant told her doctor that she was taking a Vitamin C collagen drink and no longer had any pain or disability. A few days later, at defendant's request, her doctor provided defendant's medical records to various long-term care insurance providers for the purpose of obtaining such insurance. Defendant ultimately obtained long-term care insurance policies with Prudential Insurance Company (Prudential), MetLife Insurance (MetLife), Kanawha Healthcare Solutions (Kanawha) and Unum Insurance (Unum) (sometimes collectively long-term care insurers).

Defendant filed for disability benefits as a result of an alleged August 16, 2006 fall that she claimed left her unable to perform at least two activities of daily living. Defendant sought benefits from Amtrak, Balboa, Reassure and her long-term care insurers. During the course of this disability claim, defendant received nearly $700,000 in tax-free benefits, broken down as follows: Amtrak paid $7,410; Reassure paid $32,430; Prudential paid $305,500; Kanawha paid $243,833; and MetLife paid $26,800.[4]

---

4  Unum denied defendant's claim in February 2007. After defendant appealed that decision and submitted additional documentation to support her disability claim, Unum

Defendant did not include her disability payments on her 2007, 2008 and 2009 state tax returns, which ultimately resulted in almost $60,000 in lost taxes for the California Franchise Tax Board. Defendant signed these tax returns under penalty of perjury.

In February 2007, defendant gave a statement to an insurance investigator regarding her August 2006 claim. Defendant stated she was in the process of moving a table outside when she allegedly tripped on a can of bug spray and fell down some steps. The interview was played for the jury. As a result of the fall, defendant the next day hired her cleaning lady, Kristen Ian, as her full-time "caregiver."

The record shows that despite claiming she needed a full-time caregiver and claiming she was disabled as a result of the August 2006 fall, defendant did not see her doctor until the end of August 2006 and even then, it was noted during that appointment that defendant had no trouble walking, sitting or standing. An MRI showed defendant had back arthritis and a pinched nerve.

Defendant's doctor in January 2007 ultimately withdrew as her primary care physician because, among other reasons, he believed there were "inconsistencies" between what defendant was saying about her disability and the objective findings he made. Such inconsistencies included the fact defendant was then living in Encinitas but was able to travel to his office in Idyllwild for treatment, despite her back pain that allegedly rendered her disabled.

again denied the claim. Its decision to deny the claim was upheld through an independent appeal proceeding.

These inconsistencies also were based on the fact that defendant, on the one hand, was representing to the various insurance companies that she needed a caregiver *every day* for eight to 10 hours to help her with "toileting," "dressing," "bathing" and getting in and out of bed. On the other hand, from August 2006 to August 2007, defendant lived in an upstairs apartment with no modifications to accommodate disabilities. In addition, the property manager where defendant was then living only saw a "cleaning lady" with defendant about "once a week" and witnessed defendant driving herself and walking up and down stairs without difficulty. Toward the end of her tenancy, the property manager observed defendant began parking about two blocks away from defendant's apartment.

Two doctors conducted independent medical examinations of defendant during the time period she was collecting disability and long-term care benefits. Both doctors opined that defendant neither was disabled nor in need of a caregiver during this period of time.

In another instance, defendant consulted with an orthopedic surgeon in April 2009 regarding her August 2006 fall down the stairs. At one point, defendant asked the orthopedic surgeon to fill out some disability forms stating she needed a daily caregiver to aid and assist her with daily activities including "transferring and toileting, bathing and dressing."

At some later point, the orthopedic surgeon saw a video of defendant that suggested defendant was being untruthful regarding her subjective complaints about pain due to the 2006 fall. Defendant also did not tell the orthopedic surgeon that in 2008, she and a friend had traveled extensively together to China, Seattle, Cleveland, New York City and the Dominican Republic. The orthopedic surgeon testified that, based on

6

pictures and/or video of defendant taken sub rosa and based on defendant's extensive traveling, defendant "absolutely [did] not" need a caregiver to assist with daily activities.

In response to a fraudulent claim referral in August 2007, the California Department of Insurance (DOI) commenced an investigation of defendant. During the course of its investigation, the DOI learned of suspicious activities of defendant involving other long-term care providers. The DOI noted there were discrepancies between the timesheets provided by defendant's various caregivers and the timesheets submitted to the various insurers by defendant. After a two-year investigation, the DOI referred the case to the district attorney's office for consideration.

B. *Other Insurance Claims*

In 1998, defendant had an Allstate Insurance (Allstate) renter's policy and a "personal articles floater policy" covering only "scheduled jewelry" issued by Nationwide Insurance (Nationwide) for which she had submitted appraisals to support her policy application. While on medical leave from Amtrak, defendant during this time period was living in a rental property in Idyllwild. Defendant on September 6, 1998 reported to police that her landlord had trespassed and entered her rental unit. Defendant at that time did not report anything being stolen from her residence.

However, about three weeks later, defendant again contacted police and reported a .38-caliber Smith & Wesson handgun and some credit cards had been taken during the September 6 break-in of her unit. Defendant made no mention then of the theft of any jewelry or other "heirloom items" during the break-in.

In February 1999, in connection with an insurance claim defendant again notified police and for the first time reported $100,000 worth of jewelry had also been taken

7

during the September 6 break-in. Nationwide ended up paying defendant $98,383 on this claim. More than a year later, defendant sent police a lengthy list of *other* items she for the first time also claimed had been taken during the September 6 break-in, including antique dolls, an ivory hair comb, comic books, French perfume, ornate Greek spoons, a cigar box and an Hermes scarf. Defendant requested these additional items be "documented . . . for purposes of an insurance company employee to review."

Allstate paid defendant $9,307 on her $9,489 claim for these and various other items. Dissatisfied, defendant sued Allstate for breach of contract and bad faith. Eventually, Allstate settled that suit for $5,000.

Defendant in 2001 hired a contractor, the husband of a "long-lost cousin[]," to do some remodeling work and painting on a house after her former tenants had left it a "mess." The contractor at the time lived in Colorado. When the contractor asked defendant why she wanted him to do the work, defendant said "[s]he couldn't find a decent contractor in the area." The contractor finished the work in about a week and was paid less than $5,000, which included his travel expenses. Defendant, however, subsequently filed a claim with Allstate alleging the rental had been vandalized and presented myriad forged invoices on the contractor's letterhead showing she had paid the contractor nearly $50,000 to repair the damage. Allstate in 2003 paid defendant $38,725 on this claim. When Allstate later sought to recover this money, defendant filed for bankruptcy protection.

Defendant's "luck" went from bad to worse in 2004. In September 2004, she claimed she was burglarized while living in a rental property in Fallbrook. Defendant also claimed that $300,000 worth of jewelry and other items had been stolen. Defendant

8

submitted a claim in early October 2004 under her renter's policy. She subsequently submitted an updated claim totaling about $1 million, stating she had lost at least 57 items in the alleged burglary including, among many other items, first-edition comic books that she valued at more than $250,000 alone, a Tiffany lamp, a knee-length fur coat, two bottles of 1958 Bordeaux wine, 500-year-old ancient Indian bowls and signed Babe Ruth and Mickey Mantle baseball cards.

Although the insurer under her renter's policy denied the claim, Chubb[5] paid defendant about $50,000 on this claim under a "masterpiece valuable articles scheduled policy" obtained by defendant. Chubb informed defendant her insurance policy would not be renewed effective June 26, 2005 as a result of the claim activity.

Just a few days before her Chubb policy was to be cancelled, plaintiff reported yet another loss. On June 20, 2005, defendant notified police that a Hispanic male had stolen a camera and other items from her car including a bright pink purse containing about $200,000 worth of jewelry, which defendant intended to sell that same day. Fortunately, the thief did not take the appraisals for the jewelry that were also in the car. The appraisals were attached to the police report. That report noted 28 items allegedly were stolen from defendant's car. As later discovered, the appraisals, prepared by three jewelers between 2001 and 2002, were done at or near the same time defendant purchased *and returned*, sometimes on the same day, jewelry from Costco totaling more than $100,000.

---

5        "Chubb" includes "Federal Insurance Company, Chubb Group, and Pacific Indemnity Co."

Chubb in January 2007 denied this claim, after defendant refused to be examined under oath as required by the terms of the policy. Defendant in response sued Chubb, and sought in excess of $200,000 in compensatory damages and punitive damages. As discussed in more detail *post*, during discovery in late October 2009 defendant abruptly agreed to settle her action against Chubb for $15,000, after some appraisals from Costco were produced.

C. *Defense and Rebuttal*

Defense expert Daniel Plotkin, a psychiatrist, testified defendant "suffers from mental illness, and the specific mental illness is what we call delusional disorder in which a person has false beliefs that are quite fixed and the person believes them wholeheartedly and genuinely believes them, but these beliefs are not really consistent with reality." Dr. Plotkin's diagnosis was based on three meetings with defendant. Dr. Plotkin observed that defendant initially seemed "normal," but on questioning, he described defendant as a tormented soul who believed the "world" in some way was "tilted against her."

Dr. Plotkin also opined that although "cognitively intact," defendant also suffered from a "pain disorder with psychological factors being associated." Dr. Plotkin testified it was not uncommon for a pain disorder to be associated with delusional disorder.

On cross-examination, Dr. Plotkin testified his opinion of defendant was based on her disability claims only, and not based on any claims including those involving jewelry thefts and/or home and/or car burglaries.

Orthopedic surgeon Raymond Vance testified he examined defendant and reviewed the various reports and medical records of defendant. Dr. Vance concluded

10

defendant suffered from "degenerative spondylosis and degenerative disc disease of her spine." Dr. Vance opined this condition was "consistent with the aging process with what . . . might be call[ed] wear and tear." After reviewing the surveillance films of defendant taken sub rosa, Dr. Vance found there was no inconsistency between what defendant said about her condition and what she was seen doing in the films.

On rebuttal, psychiatrist Mathew Carroll testified he disagreed with Dr. Plotkin's diagnosis that defendant suffered from delusional disorder. Dr. Carroll testified defendant was not delusional but instead was out for personal financial gain when she asked her doctors to falsify documents supporting her disability claims and when she claimed rare comic books and/or baseball cards had been stolen.

He further opined defendant was not paranoid, as suggested by Dr. Plotkin, because much of defendant's paranoia in this case was based on "true facts that people [were] legitimately following her, videotaping her, going through her bank records, checking whether she owned jewelry or not, going back and looking at previous police reports, going back and looking at previous depositions. These things [were] all true." Ultimately, Dr. Carroll believed defendant had a personality disorder related to character and a sense of entitlement.

## DISCUSSION

A. *Prosecutorial Misconduct*

Defendant contends one remark made by the prosecutor during closing argument and certain remarks made during rebuttal constituted prejudicial misconduct.

11

1. Additional Background

During opening statements, the defense argued the prosecutor was representing the insurance companies in this case. In particular, the defense argued the insurance companies wanted their money back from defendant, but "[t]heir time has come and gone. And so what vehicle do they now have to try to get their money back? That vehicle is the Department of Insurance . . . in conjunction with the State of California. [¶] So [the prosecutor] was right: she does represent the insurance company. That's a scary proposition. It's a scary proposition to have the insurance company at no loss for profits and no loss for funds to support their litigation use the district attorney's office as basically their collection agency."

In addition, the defense argued in opening that the entire case hinged on whether defendant actually believed her claims were "righteous. They don't need to be right. This ain't about money. It's not a civil case where the insurance company is just saying, 'We want our money back.' This is a specific intent crime. . . . [T]he key is, there's really two instances that we're talking about: [¶] The theft of jewelry from the car and whether or not she believes she qualifies for disability. She could be absolutely wrong, and she very well may be, but if she believes it, she's not guilty." The defense further noted that defendant was "delusional" and that she was "overly sensitive, not just to words but to pain, to her belief as to what the pain d[id] to her . . . . She doesn't have to be right. She just has to have believed it. That's what this entire case is about."

To support its claim defendant was delusional and lacked the specific intent to commit the offense, the defense noted the evidence would show "a pattern. In the face of logic, in the face of black-and-white facts, [defendant] holds to these unreasonable,

12

irrational and wrong beliefs, but yet if she believed them, she ain't guilty of fraud. Certainly [she] may owe that money back to the insurance company. That's not what we're here to decide. We're here to decide did she commit the criminal act of fraud?"

With respect to the one remark during closing, the record shows the prosecutor was summarizing the evidence of defendant's travels during the same time defendant was representing she was disabled and unable to perform daily life skills. The prosecutor noted that defendant and her friend during this same period traveled to the Dominican Republic, China, San Francisco, New York City (more than once), Seattle, Catalina Island, Florida (more than once) and Key West, Boston and New England; took road trips to Truckee, the Lake Tahoe area; and went ballooning in Temecula among many other trips and/or activities.

After going through defendant's busy travel schedule, the prosecutor commented: "I'm exhausted just looking at the itinerary and very jealous, but it's not --

"[The defense]: You[r] honor, I'm going to object to improper argument.

"The Court: Overruled for now. [¶] Go ahead.

"[The Prosecutor]: But honestly, that type of itinerary is not consistent with someone who needs a caregiver to assist them with activities of daily living, it's not consistent with someone who believes that they had chronic pain and cannot predict when pain will come and go."

During its closing, the defense reiterated the "overriding issue in this entire case" was "the psychological, the psychiatric and the mental state of [defendant]." The defense argued the evidence allegedly was "unrebutted" that defendant "suffers from Axis I delusional disorder in conjunction with paranoia and the subsets that go along with that."

13

The defense also reiterated what it had argued during the opening, that the prosecutor was representing the insurance companies and was the insurance companies' "collection agency" in this case. The defense also attacked the insurance companies' request for restitution, noting Kanawha was seeking $296,000 and Prudential $305,000 from defendant. The defense argued that the insurance companies and law enforcement were "intertwined" in this case; that if there was no conviction, there would be no restitution; and thus, that the various witnesses (including experts) testifying on behalf of the insurance companies had a motive and a "vested interest in the outcome" of this case.

Finally, the record shows the defense argued certain insurance companies in this case had made $495 million in profits in 2011. The defense asked the jury rhetorically, "Do you think they get enough already?"

The record shows on rebuttal, the prosecutor responded as follows to the defense's argument that the district attorney was merely a collection agency for the insurance companies: "I think that really upsets probably us the most because first of all, I'm not getting a commission, but second of all, that basically controverts our laws about restitution. Every victim, whether you're a rape victim, whether a residential burglary victim, whether you're a bank who's had a bank robbery, or whether you're a corporation, or whether you're Amtrak or [a] government entity is entitled by law to ask for restitution in every case.

"But I've never heard in any one of my cases where someone would say, 'Oh, how dare you residential burglary victim ask for restitution from the defendant for the money that he stole from your house or things that he did or not paid back for psychological counseling for a rape victim.'

14

"I mean, that's very unusual to call a prosecutor a collection agent for someone, a victim, just . . . exercising their right as every victim does for restitution.

"And the people don't represent just insurance companies, I represent the people of the State of California.  That's why I'm here.  If an agent does something bad and there comes a case where an agent does something illegal, we prosecute them all the time.  We don't play favorites.  If there's a an agent who rips off somebody, takes the money, doesn't invest it the way they're supposed to, we'll be the first one in line if the evidence is there to prosecute them.

"Similarly with insurance companies, if you're the [DOI], again, equal opportunity agency.  If an insurance company does something wrong, too, the consumers have rights.  They can report that as well to have, again, sanctions taken against that insurance company.  So, again, it's not as one-sided as [the defense] would have you believe."

Later, the prosecutor noted the defense blamed everyone else for defendant's conduct *except* defendant:  " 'Oh, it's . . . the insurance companies' fault, the doctor's fault in enabling her.  Everyone is at fault except for the real person who has made the most money here, [defendant].'  Isn't she at fault?

"You know, and I guess looking at their own theory, if all these people are enabling her to commit these crimes, then I guess they're asking you to enable her by acquitting her and saying that she is above the law and that she shouldn't follow it.

"And I'm asking you something different.  You know, we've heard a lot of evidence in this case.  And people hear about egregious cases.  You know, we've heard about millions earned by insurance companies where there's billions lost in fraud.

"People don't like paying extra money for health insurance or car insurance --

15

"[The defense]:  Objection, your honor.  It's improper argument.

"The Court:  I'll allow passing references to general concepts, but if it's not in the evidence, please restrict it.

"[The prosecutor]:  Nobody likes to pay extra because of fraud.  And every consumer has a right, not just the insurance companies, but consumers have a right.  That's why I say the People of the State of California, not [the prosecutor], representative of the insurance company.

"And I'm asking that when you hear these cases and you say, 'Gosh, you know, why doesn't somebody do something about this?  Someone is so egregious in taking advantage of the system.'

"Well, today, given the facts of this case, you don't only have the opportunity but the responsibility to do something about it, to say, 'Enough is enough.  You know, [defendant], it's a shame that you have some of those personality disorders, but it doesn't excuse your conduct.'  [¶]

". . . And the only person who can send a message to her that she needs to be held accountable for her actions and stop victimizing others because she has a sense of entitlement is you.  [¶]  And because of that, I'm asking you to find [defendant] guilty of all 29 counts and allegations."

2.  <u>Guiding Principles and Analysis</u>

"The standards under which we evaluate prosecutorial misconduct may be summarized as follows.  A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a

16

criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.  Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."  (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

Moreover, at closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom.  (See *People v. Bemore* (2000) 22 Cal.4th 809, 846 [noting a prosecutor "has wide latitude in describing the deficiencies in opposing counsel's tactics"].)  "In so doing, the prosecutor may highlight the discrepancies between counsel's opening statement and the evidence.  [Citation.]  Misconduct claims also have been rejected where the prosecutor anticipates the flaws likely to appear in counsel's closing argument based on evidence that was introduced [citation], and where the prosecutor criticizes the defense theory of the case because it lacks evidentiary support [citation]."  (*Ibid.*)  A prosecutor's remarks must be reviewed in the context of his or her whole argument and the jury instructions.  (*People v. Marshall* (1996) 13 Cal.4th 799, 831.)

Here, as noted, the prosecutor made one comment during closing about being "jealous" with regard to defendant's travel schedule and activities, when defendant at the same time claimed she was disabled, needed a full-time caregiver and could not perform daily life activities including toileting, bathing, dressing and transferring.  Also, the prosecutor later remarked in rebuttal—after repeatedly being accused by the defense both in opening and closing argument of merely being a "collection agent" for the insurance

17

companies and being "intertwined" with their interests in seeking restitution—about insurance fraud and made a fleeting reference to how such fraud generally impacts the costs of insurance to the public.

Viewed in this context, we conclude there is no reasonable likelihood that the jury construed or applied the complained of remarks in an objectionable fashion. (See *People v. Morales*, *supra*, 25 Cal.4th at p. 44; see also *People v. Thomas* (2012) 54 Cal.4th 908, 946 [noting prosecutor's statements that defendant should be held accountable for his actions were not improper]; *People v. Wash* (1993) 6 Cal.4th 215, 261-262 [noting no misconduct when prosecutor urged the jury to " 'make a statement,' " to "do 'the right thing' " and to restore confidence in criminal justice system by convicting defendant]; see *People v. McDaniel* (1976) 16 Cal.3d 156, 177 [rejecting contention prosecutor engaged in misconduct during argument when prosecutor asked the jury if defendant did not commit the crime, then who did because "the prosecutor was merely responding to a defense counsel argument that other persons may be responsible" for the crime and noting that even if such a statement was misconduct (by shifting the burden of proof), it was not prejudicial because the statement was "made within proper limits in rebuttal to arguments of defense counsel"].)

Moreover, even assuming the prosecutor *may* have committed misconduct in making the above remarks, we conclude defendant suffered no resulting prejudice under either *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (reasonable probability the alleged error did not affect the outcome). For one thing, the record shows the trial court instructed the jury with CALCRIM No. 222 in part as follows: "Nothing that the

18

attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence."

The court also instructed the jury with CALCRIM No. 200, which provided in part: "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial. [¶] Do not let bias, sympathy, prejudice, or public opinion influence your decision. Bias includes, but is not limited to, bias for or against the witnesses, attorneys, defendant or alleged victims, based on [among other things] socioeconomic status."

We presume the jury followed the trial court's instructions when it was instructed to ignore the remarks of the attorneys during opening and closing argument and to decide the facts of the case. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

In addition, as summarized *ante* there was overwhelming evidence of defendant's guilt in this case, as it is clear the jury rejected defendant's contention she lacked the specific intent to commit the various offenses because she was delusional. As such, any asserted error in the prosecutor's fleeting remarks, particularly under the circumstances of this case, was harmless beyond a reasonable doubt. (See *Chapman v. California*, *supra*, 386 U.S. at p. 24; see also *People v. Booker* (2011) 51 Cal.4th 141, 186 [noting that when viewing the prosecutor's statements in the context of the entire argument, there was no resulting prejudice under *Chapman* or *Watson* when the evidence of defendant's guilt was overwhelming].)

19

B. *Unanimity Instruction (Counts 6-23)*

Defendant was charged in counts 6-22 of presenting false insurance claims (§ 550, subd. (a)(1)); of submitting false documentation supporting those claims (§ 550, subd. (b)(1)); and, with the exception of Unum (which denied defendant's claim for benefits), with grand theft from each insurance provider. (Counts 6-8 [Balboa]; 9-11 [Reassure]; 12-14 [Prudential]; 15-17 [Kanawha]; 18-20 [MetLife]; and 21-22 [Unum].) In count 23, defendant was charged with grand theft from Amtrak.

Defendant contends reversal of counts 6-23 is required because each of the policies at issue in this case required defendant to continually submit claims for payment and supporting documentation. Defendant further contends a unanimity instruction was required because each of the separate acts of submitting a claim and/or supporting documentation in support thereof could have been charged separately, as noted by the prosecutor.

1. Guiding Principles

We review a claim of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) A criminal defendant is constitutionally entitled to a unanimous verdict "in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged." (*People v. Jones* (1990) 51 Cal.3d 294, 305.) A unanimity instruction is one in which the court explains to the jury " 'the need for unanimous agreement on the distinct criminal act or event supporting each charge.' " (*People v. Whitham* (1995) 38 Cal.App.4th 1282, 1295.) In other words, when a defendant is charged with a criminal offense but evidence of more than one act constituting the charged offense is introduced, the jury must be instructed that it must unanimously agree upon the *particular act*

20

committed in order to convict.  (*Ibid.*; see *People v. Beardslee* (1991) 53 Cal.3d 68, 92 [unanimity is required when there is evidence of "acts that could have been charged as separate offenses"].)  A trial court has a sua sponte duty to give a unanimity instruction " '[w]hen the evidence tends to show a larger number of distinct violations of the charged crime than have been charged and the prosecution has not elected a specific criminal act or event upon which it will rely for each allegation.' "  (*People v. Whitham*, *supra*, at p. 1295.)

The standard unanimity instruction that defendant argues should have been given is CALCRIM No. 3500 (entitled, *Unanimity*), which provides:

"The defendant is charged with _____ < *insert description of alleged offense*> [in Count _____] [sometime during the period of ____ to ____].

"The People have presented evidence of more than one act to prove that the defendant committed this offense.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

We need not decide in this case whether the court erred in failing to give sua sponte the unanimity instruction because we conclude that error was harmless under either *Chapman v. California*, *supra*, 386 U.S. at page 24 or *People v. Watson*, *supra*, 46 Cal.2d at page 836.[6]  California courts have held that the failure to give a unanimity

---

[6]    We note there appears to be a split in authority regarding which error standard applies for the failure to give a unanimity instruction.  (See *People v. Matute* (2002) 103 Cal.App.4th 1437, 1448–1449 [noting that "[s]ome cases hold that the ensuing conviction must be overturned unless the constitutional error can be demonstrated to be harmless beyond a reasonable doubt," whereas "[o]ther cases find appropriate the test [is] . . .

21

instruction is harmless "[w]here the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he [or she] committed any."  (*People v. Thompson* (1995) 36 Cal.App.4th 843, 853; see *People v. Hernandez* (2013) 217 Cal.App.4th 559, 577 [failure to give unanimity instruction is harmless error "where the defendant offered the same defense to all criminal acts and 'the jury's verdict implies that it did not believe the only defense offered' "], citing *People v. Diedrich* (1982) 31 Cal.3d 263, 283; *People v. Wolfe* (2003) 114 Cal.App.4th 177, 188 [failure to give unanimity instruction was harmless where jury rejected defendant's single defense to all instances of firearm possession].)

Here, throughout the course of committing the insurance fraud in counts 6-22, the record shows that defendant provided each of the six insurers statements and supporting documentation claiming she was disabled as a result of a back injury she sustained from a fall that occurred in August 2006, while she was moving a piece of furniture outside; and that as a result of this accident, she needed a full-time caregiver to help with daily life activities, including toileting, bathing, dressing and transferring.  Clearly, the *same* accident and the *same* injury was the basis of each specific count involving the various insurers.

In addition, the record shows defendant offered the *same* defense to all such counts: that she was incapable of forming the specific intent necessary for these crimes because she suffered from delusional disorder.  In fact, as noted *ante* the record shows

whether 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error' "].)

22

defense counsel aggressively argued during closing that defendant was innocent of all charges because she actually believed, rightly or wrongly, she was disabled and was the victim of various home and/or car burglaries. We thus conclude the record in this case, including the trial testimony, closing argument and the fact defendant offered a unitary defense to all counts, ensured that the jury must have believed beyond a reasonable doubt that defendant committed *all* of the criminal acts related to insurance fraud that she was accused of in counts 6-23, if she committed any of them. (See *People v. Thompson*, *supra*, 36 Cal.App.4th at p. 853.)

C. *Statute of Limitations (Counts 1-3)*

Defendant next contends her conviction on counts 1-3 must be reversed because the applicable four-year limitations period applicable to fraud-related offenses ran before the prosecution of such offenses commenced.

1. Additional Background

Counts 1-3 pertained to Chubb. Count 1 alleged that, between June 20, 2005—the date when defendant reported to police that a pink purse containing about $200,000 in jewelry had been stolen from her car—and November 11, 2009—the date when Chubb and defendant settled her lawsuit after Costco was referenced, defendant unlawfully and knowingly filed a false and fraudulent claim under a contract of insurance in violation of section 550, subdivision (a)(1). Count 2 alleged between these same dates defendant unlawfully presented a statement in support of her claim for payment under an insurance contract that she knew contained false and misleading information concerning a material fact, in violation of section 550, subdivision (b)(1). Finally, count 3 alleged defendant prepared a false paper for a fraudulent and deceitful purpose in violation of section 134.

23

With respect to these counts, the record shows defendant on April 28, 2006 submitted her insurance claim to Chubb with respect to the June 20, 2005 car burglary. As noted, Chubb in January 2007 denied this claim not because of fraud, but because defendant would not agree to be examined under oath with respect to that claim as required under the terms of the policy. Defendant in late January 2008 sued Chubb for breach of contract and bad faith for denying her claim.

In addition, the record shows discovery did not begin in earnest until the middle of 2009, after various motions were heard and decided. Depositions commenced in October 2009. During the course of that discovery, one of the Chubb entities (see fn. 5, *ante*) filed a motion seeking leave to file a counterclaim against defendant as a result of an earlier claim. The court never ruled on that motion, however, because as noted *ante* the case settled was settled on November 11, 2009, before the January 2010 trial date.

Finally, as also relevant to this issue, defendant on May 26, 2010 was charged by complaint with numerous fraud-related offenses, including several counts under section 550, subdivision (a)(1). That same day, an arrest warrant issued for defendant.

An amended complaint was filed on July 20, 2011 that included additional counts including count 39 (presenting a false claim between June 20, 2005 and September 22, 2009) and count 40 (presenting false and misleading information between the same dates to support a claim). Neither count 39 nor 40 named a victim. On December 14, 2011, the amended complaint was deemed the information. On September 14, 2012, the

information was amended and counts 1, 2 and 3 for the first time alleged the offenses involving Chubb for which defendant ultimately was convicted.[7]

## 2. Guiding Principles

The parties agree counts 1-3 are governed by the limitations period in section 801.5. It provides in pertinent part: "[P]rosecution for any offense described in subdivision (c) of Section 803 shall be commenced within four years after discovery of the commission of the offense, or within four years after completion of the offense, *whichever is later.*" (Italics added.) Section 803, subdivision (c) in turn provides: "A limitation of time prescribed in this chapter does not commence to run until the discovery of an offense described in this subdivision. This subdivision applies to an offense punishable by imprisonment in the state prison or imprisonment pursuant to subdivision (h) of Section 1170, a material element of which is fraud or breach of a fiduciary obligation, the commission of the crimes of theft or embezzlement upon an elder or dependent adult, or the basis of which is misconduct in office by a public officer, employee, or appointee, including, but not limited to, the following offenses: [¶] . . . [¶] (6) Felony insurance fraud in violation of Section 548 or 550 of this code . . . ."

As relevant here, "prosecution for an offense is commenced when any of the following occurs: [¶ ] (a) An indictment or information is filed. [¶] . . . [¶] (d) An arrest warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint." (§ 804.)

---

[7] Counts 1, 2 and 3 were not altered when the information was again amended on November 2, 2012, shortly before trial.

25

Also relevant here is section 803, subdivision (b).  It provides:  "No time during which prosecution of the same person for the *same conduct* is pending in a court of this state is a part of a limitation of time prescribed by this chapter."  (Italics added.)  The Law Revision Commission comment to section 803 states that the term "same conduct" contemplates "some flexibility of definition" to " 'meet the reasonable needs of prosecution, while affording the defendant fair protection against an enlargement of the charges after running of the statute.' "  (*People v. Whitfield* (1993) 19 Cal.App.4th 1652, 1659.)

Courts of appeal have determined that section 803, subdivision (b) tolls the running of the statute of limitations for disparate charges that arise from a course of conduct; new counts, therefore are deemed filed as of the date of the original complaint. (See, e.g., *People v. Greenberger* (1997) 58 Cal.App.4th 298, 369 [noting murder and aggravated kidnapping charges were based upon the "same conduct," permitting the jury to be instructed on the lesser offense of simple kidnapping without running afoul of the statute of limitations]; *People v. Bell* (1996) 45 Cal.App.4th 1030, 1064 [noting charges of forgery and false filings of bankruptcy petitions or grant deeds were found to be based upon the "same conduct" for purposes of subdivision (b) of section 803 as rent skimming where "the forgery and false filings were merely aspects of [the] rent skimming scheme"]; *People v. Whitfield*, *supra*, 19 Cal.App.4th at pp. 1658-1660 [noting that filing an information charging a defendant with forcible rape among many other sexual offenses against two victims that occurred within the course of a couple of months tolled period of limitations as to lesser related offense of prostitution for purposes of subdivision (b) of section 803 because the " 'conduct' at issue was sexual intercourse

26

between defendant [and the two victims], both of whom claimed the conduct constituted rape while defendant claimed it was in each case simply an act of prostitution"].)

The question of whether a prosecution is barred by the statute of limitations is reviewed as an issue of law concerning a jurisdictional defect. When the facts are not in dispute, we exercise our independent judgment. (*People v. Wetherell* (2014) 223 Cal.App.4th Supp. 12, 16–17; *Pugliese v. Superior Court* (2007) 146 Cal.App.4th 1444, 1448.)

3. <u>Analysis</u>

Here, the threshold issue is, when did the criminal prosecution commence for purposes of the limitations period with respect to counts 1, 2 and 3 involving Chubb. Defendant contends the prosecution *may* have commenced on May 26, 2010, when the criminal complaint was filed and the arrest warranted was issued. Even using May 26, 2010 as the commencement date, defendant further contends the applicable four-year limitations period bars criminal prosecution for counts 1-3.

The People contend May 26, 2010 controls for purposes of the statute of limitations because the September 14, 2012 amended information involved the "same conduct" as the May 26 criminal complaint/arrest warrant. The People make this argument despite the fact the May 26 criminal complaint did not include the counts involving Chubb that ultimately defendant was convicted of by the jury.

We need not resolve this threshold issue because regardless of how it is resolved, we are unable to determine on this record whether counts 1-3 are time-barred. Indeed, although there is evidence in the record suggesting Chubb did not "discover" (as provided in sections 801.5 and section 803, subdivision (c)) defendant's alleged fraud until late

27

2009, when discovery began in earnest and defendant was deposed, the record also shows defendant was expressly charged in counts 1-3 of engaging in fraudulent acts with respect to her claim (i.e., June 20, 2005) that fall outside the four-year limitations period of section 801.5, even assuming the May 26, 2010 date governs for this issue.

When a charging document suggests or "indicates on its face that the action is time-barred, a person convicted of a charged offense may raise the statute of limitations at any time," including on appeal. (See *People v. Williams* (1999) 21 Cal.4th 335, 341.) Thereafter, if the record establishes that the action is not time-barred, the conviction may stand; if, however, the appellate court cannot determine from the record whether the action is time-barred, it should remand for a further hearing. (*Id.* at pp. 341, 345–346.) We conclude the matter should be remanded.

We reiterate that we do *not* decide in this case (i) when the prosecution commenced under section 804 on counts 1-3 (i.e., on May 26, 2010, on September 14, 2012 *or* perhaps some other date) and (ii) depending on the resolution of that issue, whether counts 1-3 are time-barred by the four-year limitations period set forth in section 801.5. These matters are better left to the trial court to decide after a hearing. (See *People v. Williams*, *supra*, 21 Cal.4th at p. 345 [noting the "silent record" such as in the instant case regarding the statute of limitations defense "is partly the defendant's fault for not raising the issue at trial," but is also "the prosecution's fault in the first instance for filing an information that, on its face, was [perhaps] untimely," and thus noting in this situation the "the fairest solution is to remand the matter to determine whether the action is, in fact, timely"].)

D. *Sufficiency of the Evidence (Count 5)*

Defendant contends there is insufficient evidence in the record to show Chubb relied on her representations regarding the jewelry theft in settling the lawsuit against it for $15,000.

With respect to count 5, theft by false pretense in violation of section 487, the jury was instructed in part as follows:

"To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant knowingly and intentionally deceived a property owner by false or fraudulent representation or pretense; [¶] 2. The defendant did so intending to persuade the owner to let the defendant take possession and ownership of the property; [¶] AND [¶] 3. The owner let the defendant take possession and ownership of the property because the owner *relied* on the representation or pretense." (Italics added.)

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Valdez* (2004) 32 Cal.4th 73, 104.) . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. (*People v. Ramirez* (2006) 39 Cal.4th 398, 463.) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Valdez, supra*, 32 Cal.4th at p. 104.) A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.

29

(*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.)' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

A lawyer representing Chubb in the breach of contract/bad faith action brought by defendant testified that Chubb agreed to settle that action for $15,000 because defendant claimed she owned $200,000 of jewelry that was stolen. The Chubb lawyer also testified that in evaluating defendant's claim, Chubb had to rely on defendant's credibility because "[t]here were no real witnesses to the transaction where she allegedly first obtained that jewelry"; that defendant provided Chubb with about 38 pages of appraisal certificates supporting her claim she owned the jewelry in question; that Chubb relied on the accuracy of a police report that was prepared in connection with the June 20, 2005 car burglary; that ultimately, whether or not there was fraud was not for Chubb to decide but for a jury to determine; that when Chubb was first sued it did not file a cross-complaint against defendant as a result of any alleged misstatement or omission, thereby suggesting at least initially Chubb did not believe the claim was false or fraudulent; that during discovery in the action, evidence was uncovered suggesting the car burglary was "perhaps false"; that when the case settled for $15,000, there was still "a significant amount of discovery yet to be completed in contemplation of a trial date which had been scheduled in January of 2010"; that Chubb did not contact the district attorney's office in connection with defendant's claim on or the parties' settlement, but instead the district attorney contacted Chubb and served a subpoena requesting Chubb produce its claim's file; and that when the Chubb lawyer questioned defendant regarding an appraisal from Costco, defendant said she had never seen it before and "right after that" defendant

30

agreed to settle with Chubb before Chubb's attorney "had the opportunity to explore" the Costco appraisal further.

That there was also evidence in the record suggesting Chubb settled with defendant in part because it wanted to avoid the costs of litigation does not change our conclusion on this issue. (See *People v. Valdez*, *supra*, 32 Cal.4th at p. 104 [noting that if substantial evidence exists, a reversal of a finding or judgment is not warranted simply because the record includes evidence that, if credited, might support a contrary finding].)

On this record, we conclude the above evidence, including the inferences to be drawn from it, supports the finding of the jury that Chubb "relied" on defendant's representation that she owned $200,000 worth of jewelry and that this jewelry was stolen when her car was burglarized on June 20, 2005 in settling her breach of contract/bad faith action for $15,000 in late 2009. (See *People v. Miller* (2000) 81 Cal.App.4th 1427, 1440-1441 [noting to establish criminal fraud, the victim must have in fact relied on the defendant's false representations or material omissions—i.e., that " 'the false representation "materially influenced" the owner's decision to part with his property' "].)

E. *Sufficiency of the Evidence (Count 23)*

Defendant also contends there is insufficient evidence in the record to support her conviction on count 23, grand theft of personal property involving Amtrak. Count 23 provided that between April 1, 2009 and April 26, 2010, defendant stole money or personal property of Amtrak in excess of $400. The record shows a claims representative testified defendant made a disability claim based on her August 2006 fall. That claim was accompanied by a doctor's note dated September 30, 2006. As a result, defendant received payments from Amtrak from November 2006 through March 2008.

31

The record shows, and defendant does not dispute (in her reply), that during deliberations the jury sent a note requesting clarification of the date range for "Amtrak, count 23." The note stated count 23 " 'says 4-1-2009–4-26-2010 but People's [Exhibit] # 112 has other dates.' " According to the minute order, the prosecutor was present in the courtroom when the note was received and she and the trial judge spoke to defense counsel "via conference call . . . regarding the proposed changes to the verdict forms and the Court's proposed response" to this note and to another note that is not relevant here.

The record also shows the verdict form used by the jury stated that defendant in count 23 committed grant theft in violation of former[8] section 487, subdivision (a) against Amtrak between August 16, 2006 and January 29, 2008.

Thus, the record shows the jury verdict form for count 23 removed any ambiguity or uncertainty regarding the date or dates defendant was alleged to have committed grand theft against Amtrak. What's more, substantial evidence in the record supports defendant's conviction on count 23, as the record shows Amtrak (through its claim representative) paid defendant benefits in excess of $400 during the dates included on the verdict form. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.)

F. *Remaining Contentions*

1. Enhancements

Defendant next contends that if *any* of her convictions are reversed, the three enhancements also must be reversed. We disagree.

---

8    Section 487, subdivision (a) has since been amended to provide that grand theft occurs when "money, labor, or real or personal property taken is of a value exceeding nine hundred fifty dollars ($950) . . . ." (See Stats. 2010, ch. 694, § 1.)

32

Briefly, as noted the jury found true that in the commission of the offenses (i) defendant took funds and/or property of another in excess of $100,000, within the meaning of sections 1203.045, subdivision (a) and 186.11, subdivision (a)(1); (ii) the aggregate losses to the victims from all charges exceeded $200,000 within the meaning of section 12022.6, subdivision (a)(2); and (iii) defendant, in the commission of two or more related felonies a material element of which was fraud and embezzlement and which involved a pattern of related felony conduct, took more than $500,000 within the meaning of section 186.11, subdivision (a)(2). For each of these enhancements, the jury was instructed it could find the aggregate loss if it found defendant guilty of two or more crimes charged in counts 1, 2, 5-24, 26 and 28.

Here, although we are reversing counts 1-3 involving Chubb and remanding the matter with instructions for a hearing, there is ample evidence in the record to support the true findings of the jury with respect to each enhancement, as evidenced by the jury's guilty verdicts on the remaining counts and by the monetary loss suffered by the victims, which amounts clearly exceed the aggregate loss of each enhancement. We thus reject this contention.

2. Stay

Defendant's final contention is that counts 4, 25, 27 and 29 must be stayed under subdivision (a) of section 654, which provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

33

" ' "Whether a course of criminal conduct is divisible . . . depends on the intent and objective of the actor." [Citations.] "If all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." [Citation.]' " (*People v. Spirlin* (2000) 81 Cal.App.4th 119, 129.) However, if a defendant entertained "multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267–268.)

Whether section 654, subdivision (a) applies "is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

Defendant was convicted in count 4 of attempted perjury stemming from the October 20-22, 2009 depositions taken by Chubb. In count 5, as discussed *ante* defendant was convicted of grand theft in accepting the $15,000 settlement check from Chubb. We note from the record that the settlement between defendant and Chubb was not finalized until on or about November 11, 2009. Thus, the record shows that defendant had ample opportunity to reflect between the two offenses, which supports the court's finding that defendant's receipt of the $15,000 check was a distinct act from her

34

false depositions statements. (See *People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 [noting "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment [for purposes of section 654]"]; see also *People v. Felix* (2001) 92 Cal.App.4th 905, 915 (*Felix*) [noting "multiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm"].)

Defendant was convicted in counts 25, 27 and 29 of perjury by declaration. She contends section 654, subdivision (a) applies to stay punishment on each of these counts because they allegedly were part of an indivisible course of conduct with the fraud at issue in counts 1-22. We disagree.

Counts 25, 27 and 29 alleged defendant committed perjury when she signed and filed her 2007, 2008 and 2009 state tax returns, respectively, because she failed to disclose the payments she was receiving under the various insurance policies at issue in this case. We note from the record that defendant filed her 2007, 2008 and 2009 returns on January 7, 2009, August 13, 2010 and August 10, 2010.

We conclude section 654, subdivision (a) does not apply to stay punishment on counts 25, 27 and 29 because there is evidence in the record supporting the finding that defendant had a separate intent and objective in signing and filing each tax return. Indeed, we note all were filed on separate dates, with the 2007 return being filed more than a year *before* the 2008 and 2009 returns. (See *Felix*, *supra*, 92 Cal.App.4th at p. 915; *People v. Andra* (2007) 156 Cal.App.4th 638, 640 [noting section 654, subdivision (a) does not apply " 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before

35

committing the next one, thereby aggravating the violation of public security or policy already undertaken' "].)  Moreover, each time defendant signed and filed a tax return involved a separate and factually distinct act/crime.  (See *People v. Correa* (2012) 54 Cal.4th 331, 341 [noting a " 'person who commits separate, factually distinct, crimes, even with only one ultimate intent and objective, is more culpable than the person who commits only one crime in pursuit of the same intent and objective' "].)

In addition, with respect to the 2008 and 2009 returns, the record shows defendant filed her returns *after* she had been charged with 38 counts of insurance fraud.  This evidence further supports the finding that, at least with respect to these two returns, defendant's intent and objective in submitting false tax returns was separate and distinct from her intent to "obtain" money from the various insurers.  We thus conclude section 654, subdivision (a) does not apply to stay punishment on counts 25, 27 and 29.

## DISPOSITION

Because on this record we are unable to determine whether counts 1-3 are time-barred based on the applicable statute of limitations, we reverse defendant's conviction with respect to these counts only and remand the matter to the trial court to determine both (i) when the prosecution of counts 1-3 commenced and, depending on the outcome of that issue, (ii) whether in fact counts 1-3 are time-barred by the applicable limitations period. If the court ultimately determines counts 1-3 were timely commenced, it then can reinstate defendant's conviction on these counts. If it concludes these counts were not timely commenced, defendant is to be resentenced accordingly. In all other respects, the judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

McINTYRE, J.

37